IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT DANIEL ALLEN,            )
AIS #252342,                    )
                                )
        Plaintiff,              )
                                )
v.                              )        Case No.: 2:17-CV-25-WC
                                )        [WO]
                                )
WILCOTT RAHMING, *et al.*,      )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint and amendment thereto filed by Robert Daniel Allen, an indigent state inmate, in which he alleges the defendants violated his constitutional rights by failing to provide him adequate medical treatment for his multiple myeloma and deep vein thrombosis during his prior term of incarceration at the Kilby Correctional Facility. Doc. 1-1 at 3. Specifically, Allen alleges Dr. Rahming acted with deliberate indifference to his medical needs when he discontinued his blood thinner in October of 2016 and ignored the recall of his IVC filter. Doc 1-1 at 2–3. Allen names Dr. Wilcott Rahming, Nurse Valencia Lockhart, a Physician's Assistant, and Nurse Marianne Baker, a Certified Registered Nurse Practitioner, all medical personnel employed at Kilby during the time period relevant to the complaint, as defendants. Allen

seeks monetary damages for the alleged violations of his constitutional rights and requests that the defendants be subjected to criminal prosecution. Doc. 1-1 at 3.

The defendants filed a special report, supplemental reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Allen's medical records, addressing the deliberate indifference claims presented against them. In these documents, the defendants assert that at all times they provided medical treatment to Allen in accordance with their professional judgment and adamantly deny any violation of Allen's constitutional rights.

After review of the defendants' special reports and supporting exhibits, the court issued orders directing Allen to file a response to the arguments set forth by the defendants in their reports and advising him that any response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 38 at 2; Doc. 52 at 2–3. These orders specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 38 at 3; Doc. 52 at 3 (same). Allen filed responses to these orders and submitted exhibits in support of his responses. *See* Doc. 33; Doc. 41; Doc. 54; Doc. 57; and Doc. 69.

Pursuant to the directives of the aforementioned orders, the court now treats the defendants' special report and supplemental special reports as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed. R. Civ. P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of

proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*,

548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose of an affidavit for purposes of summary judgment).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted.  *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986), Fed. R. Civ. P. 56(e).  "A mere 'scintilla' of evidence supporting the supporting party's position will not suffice[.]" *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the

material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the officers' motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . . Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."). However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). In addition, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks

personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24; *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525. Thus, a plaintiff's *pro se* status alone does not compel this court

to disregard elementary principles of production and proof in a civil case. Here, after a thorough and exhaustive review of all the evidence which would be admissible at trial, the court finds that Allen has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III. DISCUSSION

### A. Deliberate Indifference

Allen alleges that the defendants denied him adequate medical treatment for his multiple myeloma and conditions related to his myeloma. In their responses, the defendants adamantly deny acting with deliberate indifference to Allen's medical needs.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

Under well settled law, neither medical malpractice or negligence equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . ., Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an

objectively serious medical need[] . . . and second, that the response made by [the defendant] to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnos[is] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). To proceed on a claim challenging the constitutionality of medical care "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986); *Estelle*, 429 U.S. at 106 (holding that neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 836 (observing that a complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) (holding that "[m]ere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate's complaint because "misdiagnosis and inadequate treatment involve no more than medical negligence.").

Additionally, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which

the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted) (alterations in original).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.   When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)].  Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292

("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and citation omitted). Moreover, the law is clear that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

The defendants submitted several affidavits and relevant medical records in response to the complaint filed by Allen. After a thorough and exhaustive review of the medical records submitted in this case, the court finds that the details of medical treatment provided to Allen as set forth by the defendants in their affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process.

These records also refute several allegations made by Allen regarding his compliance in taking prescribed medications and the orders of his free world oncologist.

In his initial affidavit, Dr. Rahming addresses the allegations of deliberate indifference, in relevant part, as follows:

> I absolutely deny Mr. Allen's allegations, which are completely false. Although I discontinued Mr. Allen's Warfarin prescription on October 11, 2016, in my medical judgment discontinuing the medication was necessary at that time due to Mr. Allen's habitual non-compliance with the medication, as well as with the other directives of the providers on the Kilby medical staff, and the medication's potential side effects. As a blood thinner, Warfarin increases the risk of dangerous bleeding, including both internal bleeding and in the event of trauma. As confirmed through numerous examinations by medical providers, Mr. Allen experienced no complications whatsoever from the discontinuation of his Warfarin. After I learned that Mr. Allen previously underwent the insertion of an inferior vena cava ("IVC") filter, I placed him back on Warfarin on December 29, 2016. An IVC filter is a medical device designed to catch large, potentially fatal blood clots from traveling to the lungs, but such filters paradoxically increase the risk of blood clotting.
>
> Throughout Mr. Allen's incarceration at Kilby, including in the year prior to October of 2016, he received excellent care for his DVT. As evident from Mr. Allen's medical records, I and other medical providers on the Kilby medical staff diligently monitored his DVT through lab work and regular assessments, examined him at regular intervals and provided appropriate treatment, including medications. However, Mr. Allen repeatedly chose not to comply with the directives of the medical providers by routinely failing to take his medications as prescribed for him; regularly ignoring the providers' counseling regarding the importance of medication compliance; and routinely failing to appear for his scheduled visits in the chronic care clinic.
>
> Medical providers on the Kilby medical staff monitored Mr. Allen's DVT through the chronic care clinic process. The medical staffs at the ADOC facilities evaluate and treat certain pre-defined chronic medical conditions through the chronic care clinic process. The conditions treated at the chronic care clinics include, for example, DVT, hypertension, hepatitis C, diabetes, gastroesophageal reflux disease, chronic obstructive pulmonary disease, hyperlipidemia as well as others. An inmate may be seen for multiple conditions during a single chronic care visit. The medical staffs at the ADOC facilities determine, based upon the condition of the inmate,

whether an inmate is seen at intervals of thirty (30), sixty (60) or ninety (90) days. The inmates are not charged any payment whatsoever for their visits to the chronic care clinic.

I along with the other medical providers on the Kilby medical staff examined Mr. Allen at the regularly scheduled chronic care clinics in the year prior to October 11, 2016, i.e. when I discontinued his Warfarin prescription. During Mr. Allen's visits to the chronic care clinic, providers and other members of the medical staff examined him, assessed the status of his DVT and other medical conditions, performed international normalized ratio ("TNR") measurements and adjusted his medications if necessary. The INR measurement tests the coagulation or clotting tendency of blood. For a healthy person, the normal INR range is 0.8-1.2. For an individual taking Warfarin, his or her INR would normally measure in the 2.0-3.0 range. Throughout the year prior to October 11, 2016, Mr. Allen's INR typically measured within, or just outside of, the normal range for someone taking Warfarin.

In the year prior to October of 2016, I and other medical providers prescribed Mr. Allen with Warfarin to treat his DVT. Warfarin effectively treats blood clotting by thinning the blood. However, as a blood thinner, Warfarin's side effects include an increased risk that a patient may experience dangerous bleeding. Throughout Mr. Allen's incarceration at Kilby, I and other medical providers carefully regulated his Warfarin prescription and adjusted it periodically to ensure he took as small amount as necessary to reduce his exposure to its side effects.

The Kilby medical staff treated not only Mr. Allen's DVT but also his other medical conditions, including multiple myeloma. Multiple myeloma is a cancer of the white blood cells. I and other providers routinely referred Mr. Allen off site for specialty treatment of his multiple myeloma and numerous rounds of chemotherapy treatment during the period of time between October of 2015 and October of 2016. We also referred Mr. Allen for routine visits to his off-site oncologist, Dr. Krishnamohan Basarakodu ("Dr. Basarakodu"), in Montgomery, Alabama.

Despite the medical staff's diligent efforts to care for Mr. Allen, he routinely refused to comply with the directives entered by me and the other providers in the year prior to October 11, 2016. For example, in the year prior to October of 2016, Mr. Allen failed to appear for scheduled appointments in the chronic care clinic on six (6) separate occasions. During that same period of time, Mr. Allen was routinely non-compliant with his medications, including Warfarin. Mr. Allen failed to take his Warfarin on at least twenty-six (26) separate occasions in the year prior to October 11, 2016, including on four (4) occasions in the month prior to that date.

The medical providers on the Kilby medical staff extensively counseled Mr. Allen on numerous occasions regarding his non-compliance with his medications and the directives of the providers, but to no avail. I met with Mr. Allen on the following occasions to counsel him regarding the importance of taking his medications in compliance with the directives of his providers: August 10, 2015; December 4, 2015; January 11, 2016; February 10, 2016; April 28, 2016; and July 25, 2016. In response to my counseling efforts, Mr. Allen refused to acknowledge his behavior and repeatedly denied he missed his medications, despite clearly documented proof to the contrary.

The medical staff continued treating Mr. Allen's DVT throughout the weeks prior to October 11, 2016, i.e. when I discontinued his Warfarin. For instance, on September 20, 2016, I entered an order prescribing Mr. Allen with Warfarin for thirty (30) days and directing the medical staff to administer the medication every day, but alternating between four (4) and five (5) mg each day.

Although the Kilby medical staff scheduled Mr. Allen to attend the September 26, 2016, chronic care clinic, he refused to attend the clinic on that date.

Mr. Allen followed up with his off-site oncologist on September 29, 2016. During this appointment, Mr. Allen also underwent chemotherapy and other forms of treatment for his cancer. Dr. Basarakodu, the oncologist, examined Mr. Allen during the September 29, 2016, visit. Dr. Basarakodu's examination detected "no significant change" in Mr. Allen's symptoms, and the oncologist concluded most of the symptoms were "not new." Dr. Basarakodu recommended the Kilby medical staff continue the previously prescribed course of treatment for Mr. Allen. A nurse practitioner on the Kilby medical staff, Marianne Baker ("Ms. Baker"), reviewed the documentation relating to Mr. Allen's [off-site] visit to Dr. Basarakodu on September 29, 2016, and entered appropriate orders implementing the oncologist's recommendations.

Ms. Baker saw Mr. Allen in the chronic care clinic on October 5, 2016. At that time Mr. Allen's primary concern was a request to renew his Phenergan prescription for nausea. Ms. Baker completed a normal assessment of Mr. Allen and noted his stable condition. Ms. Baker entered orders on October 5, 2016, prescribing Mr. Allen with 25 mg of Phenergan to take every six (6) hours for thirty (30) days on an as-needed basis for nausea as well as a medication for his hypertension.

After reviewing Mr. Allen's medical file and noting his documented non-compliance despite extensive counseling by his medical providers, I entered an order on October 11, 2016, discontinuing Mr. Allen's Warfarin prescription. In my medical judgment, Mr. Allen's failure to take his

Warfarin as directed by his providers prevented the medication from effectively treating his DVT. Because the medication created a risk Mr. Allen could bleed out, I determined the safer course of treatment involved discontinuing the prescription. As a secondary consideration, I hoped discontinuing the medication would jar Mr. Allen into realizing the seriousness of his non-compliance and lead him to follow the directives of his medical providers.

Mr. Allen continued receiving thorough medical care at Kilby following my October 11, 2016, order discontinuing his Warfarin, and he never experienced any complication whatsoever from that decision. On October 13, 2016, Mr. Allen underwent chemotherapy treatment at an off-site facility. A member of the Kilby nursing staff [observed] Mr. Allen on October 13, 2016, following his return to the facility. The nurse assessed Mr. Allen at that time, and found no abnormal indications. Moreover, Mr. Allen denied any complaints at that time.

Furthermore, although the medical staff scheduled Mr. Allen for an appointment in the October 24, 2016, chronic care clinic, he declined to attend the clinic.

Mr. Allen went off site for an appointment with his treating oncologist, Dr. Krishnamohan Basarakodu, on October 27, 2016. Dr. Basarakodu examined Mr. Allen on October 27, 2016, and found his symptoms largely unchanged compared to previous examinations. Mr. Allen informed Dr. Basarakodu during the October 27, 2016, appointment that I discontinued his Warfarin. Dr. Basarakodu informed Mr. Allen that the oncologist deferred to my judgment whether to continue Mr. Allen on Warfarin. [Dr. Basarakodu explained that "it was Dr. Rahming's call" regarding discontinuation of the blood thinner. Doc. 21-6 at 14.] Following the October 27, 2016, appointment, Dr. Basarakodu made a number of recommendations to the Kilby medical staff, but he did not recommend restarting Mr. Allen's Warfarin. Indeed, Dr. Basarakodu's recommendations focused on continuing the then-current course of treatment for Mr. Allen and scheduling him for a follow-up appointment. Both Ms. Baker and I reviewed the documentation from Mr. Allen's October 27, 2016, appointment with the off-site oncologist, and we entered appropriate directives implementing the oncologist's recommendations.

Mr. Allen saw a member of the Kilby nursing staff on October 31, 2016, following a visit to an off-site facility for chemotherapy treatment earlier that day. The nurse assessed Mr. Allen at that time and found no indications of distress. Mr. Allen denied any complaints on October 31, 2016.

I also examined Mr. Allen on October 31, 2016, and reviewed the documentation relating to his off-site visit for chemotherapy treatment. I

noted the oncologist's recommendation for a follow-up visit in two (2) weeks as well as the conclusion that Mr. Allen was tolerating the chemotherapy well. My October 31, 2016, examination detected no indications Mr. Allen experienced any complications from the termination of his Warfarin.

Mr. Allen saw a member of the Kilby nursing staff on November 10, 2016, following his visit to an off-site facility for chemotherapy treatment and lab work. The nurse assessed Mr. Allen and confirmed the absence of any acute distress.

A physician's assistant on the Kilby medical staff, Valencia Lockhart ("Ms. Lockhart"), also saw Mr. Allen on November 10, 2016, following his return from the off-site visit. Ms. Lockhart noted that Mr. Allen's oncologist had not recommended changes to Mr. Allen's care. Ms. Lockhart directed the Kilby medical staff to continue the plan for Mr. Allen's care.

A physician on the Kilby medical staff saw Mr. Allen in the chronic care clinic on November 14, 2016. The physician examined Mr. Allen at that time and detected no indications of any discomfort, swelling or any other indications whatsoever of any complication from the discontinuation of his Warfarin. The physician noted Mr. Allen's non-compliance with the medications prescribed by his medical providers. The physician counseled Mr. Allen on November 14, 2016, regarding the importance of complying with his medications.

Mr. Allen saw his off-site oncologist, Dr. Basarakodu, again on December 1, 2016. Dr. Basarakodu examined Mr. Allen during the December 1, 2016 visit. Dr. Basarakodu's examination detected "no significant change" in Mr. Allen's symptoms and concluded that most of them were "not new." Mr. Allen expressed concerns to Dr. Basarakodu regarding my decision to discontinue the Warfarin. On December 1, 2016, Dr. Basarakodu stressed to Mr. Allen that he deferred to my judgment whether to restart Mr. Allen's Warfarin. [Again, advising Allen that the decision to discontinue the blood thinner "was Dr. Rahming's call." Doc. 21-6 at 6.] Following the December 1, 2016, examination, Dr. Basarakodu provided a number of recommendations to the Kilby medical staff, but he did not recommend restarting Mr. Allen's Warfarin.

Mr. Allen saw a member of the Kilby nursing staff on December 1, 2016, following his return from the visit to the off-site oncologist, Dr. Basarakodu. Mr. Allen denied any complaints at that time. The nurse assessed Mr. Allen and confirmed the absence of acute distress.

Ms. Lockhart also saw Mr. Allen later that same day, December 1, 2016. Mr. Allen did not express any concerns to Ms. Lockhart during the December 1, 2016, visit regarding the termination of his Warfarin. Ms. Lockhart examined Mr. Allen at that time and did not detect any indications of any complications or acute development whatsoever.

A physician on the Kilby medical staff examined Mr. Allen at the December 28, 2016, chronic care clinic. The physician's examination found no indications of any concerning development since the November 14, 2016, chronic care clinic. The physician detected no indications of any acute distress or any discomfort whatsoever on December 28, 2016. At that time, Mr. Allen asked for clarification regarding the decision to discontinue his Warfarin, and the physician noted he would discuss this issue further with Mr. Allen's other providers.

Mr. Allen submitted a sick call request form on December 29, 2016, requesting a discussion with a medical provider regarding restarting his blood thinning medication. The nursing staff scheduled Mr. Allen to be seen at the December 30, 2016, sick call.

Mr. Allen also saw his off-site oncologist, Dr. Basarakodu, on that same day, i.e. December 29, 2016. During the December 29, 2016, visit, Mr. Allen received chemotherapy and other treatments for his cancer. Dr. Basarakodu also examined Mr. Allen and found no significant changes from previous examinations. During the December 29, 2016, visit, the oncologist discussed Mr. Allen's DVT. As Dr. Basarakodu informed Mr. Allen, the oncologist deferred to me with respect to restarting Mr. Allen's Warfarin. [Dr. Basarakodu specifically advised Mr. Allen that "Dr. Rahming will decide on restarting anticoagulation. Doc. 21-5 at 354.] Significantly, Dr. Basarakodu's recommendation following the December 29, 2016, examination did not include any recommendation to restart Mr. Allen's Warfarin.

However, Mr. Allen mentioned to Dr. Basarakodu during the December 29, 2016, visit that Mr. Allen previously underwent a procedure to insert an IVC filter. As indicated above, an IVC filter prevents large, potentially fatal blood clots from reaching the lungs, but such filters also may increase the frequency of blood clotting. Dr. Basarakodu called me on December 29, 2016, to inform me of Mr. Allen's IVC filter [but did not order restarting the Warfarin and specifically referred to my judgment on this matter].

Ms. Baker saw Mr. Allen on December 29, 2016, following his return from his off-site visit to Dr. Basarakodu. Ms. Baker examined Mr. Allen at that time, and she did not detect any indications that the discontinuation of his blood thinner caused discomfort or any other negative effect.

That same day, i.e. December 29, 2016, I entered an order for Mr. Allen to undergo an x-ray of his kidneys, urethra and bowel area to confirm the IVC filter Mr. Allen indicated had been inserted in him [was still in place]. The December 29, 2016, x-ray revealed an IVC filter in Mr. Allen's upper thigh, but found no obstruction and was otherwise normal.

The presence of the IVC filter led me to re-evaluate prescribing Warfarin for Mr. Allen. Prior to December 29, 2016, I did not know there was an IVC filter in Mr. Allen's leg. Because the filter increased the risk of blood clotting, I determined that restarting Mr. Allen's Warfarin was appropriate. In my medical judgment, the risk of blood clotting from the IVC filter and Mr. Allen's DVT outweighed the risk of [him] bleeding out. On December 29, 2016, I entered an order prescribing Mr. Allen with Warfarin for thirty (30) days.

Ms. Baker followed up with Mr. Allen in the December 30, 2016, chronic care clinic. Ms. Baker assessed Mr. Allen during that visit and confirmed his condition was stable. Ms. Baker extensively counseled Mr. Allen on the importance of complying with the medical providers' medication prescriptions and lab work, and she cautioned him about the possible negative effects of his non-compliance with the medications, lab work and chronic care visits. Ms. Baker's December 30, 2016, assessment did not detect any changes in Mr. Allen's condition compared to her [assessment conducted on October 5, 2016 prior to the discontinuance of Mr. Allen's Warfarin]. Ms. Baker did not detect any indications Mr. Allen suffered any discomfort of any kind from the discontinuation of his Warfarin on October 11, 2016.

In light of Mr. Allen's discussion with Ms. Baker on December 30, 2016, and the decision to restart his Warfarin prescription [on December 29, 2016], Mr. Allen declined his appointment at the December 30, 2016, sick call.

I renewed Mr. Allen's Warfarin prescription on January 5, 2017.

A physician on the Kilby medical staff [conducted an appointment with] Mr. Allen at the January 9, 2017, chronic care clinic. The physician examined Mr. Allen at that time and found no indications of significant changes from previous assessments. Mr. Allen indicated he was doing "okay" on January 9, 2017.

On January 10, 2017, I renewed Mr. Allen's Warfarin prescription through February 8, 2017, and increased the dosage to four (4) mg per day.

During the period of time since January 10, 2017, I and other medical providers on the Kilby medical staff have continued monitoring Mr. Allen's DVT and providing appropriate treatment, including medications.

Throughout Mr. Allen's incarceration at Kilby, he received thorough, appropriate medical care, including extensive treatment for his DVT [and cancer]. The care provided Mr. Allen by the providers and other members of the Kilby medical staff included numerous examinations; routinely-scheduled appointments in the chronic care clinic; a variety of medications, including pain medications; lab work and diagnostic procedures; and regular referrals off site for appointments with medical specialists and for specialty

treatment[,] [including routine appointments for chemotherapy and examinations by his free world oncologist]. The Kilby medical staff continued providing this care despite Mr. Allen's persistent non-compliance with the course of treatment.

Based upon my review of Mr. Allen's circumstances, I am confident that he has received an appropriate level of treatment. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Allen received was inappropriate in any way or that the conduct of the Kilby medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, the Kilby medical staff acted appropriately in all respects. Again, based upon my review of Mr. Allen's medical records, I can state to a degree of medical certainty that the members of the medical staff at Kilby fully satisfied the standard of care owed by them . . . .

There is no evidence or objective data of any kind suggesting that Mr. Allen's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. Any allegation by Mr. Allen that he currently does not have access to the medical services available to him at Kilby is simply untrue.

Doc. 21-1 at 2–13 (paragraph numbering and internal citations to medical records omitted).

Dr. Rahming filed a supplemental affidavit further addressing Allen's claims challenging the alleged recall of his IVC filter, the order for discontinuance of his blood thinner, his failure to take his medication as prescribed by medical personnel and the lack of treatment provided for conditions which could have indicated the presence of blood clots. This affidavit provides the following information:

**"[Mr. Allen's] IVC filter has been recalled on two separate occasions and Dr. Rahming refuses to 'check it.'" . . . .** This allegation is incorrect, and I deny it entirely. I do not know of any basis for Mr. Allen's claim that his inferior vena cava ("IVC") filter has been recalled. I am not aware of any documentation establishing the make, model and/or manufacturer of Mr. Allen's IVC filter. Without this documentation, I do not know of any means of determining whether the manufacturer of Mr. Allen's IVC filter recalled the device. Even if I could determine the make, model, and manufacturer of Mr. Allen's IVC filter, and even if I received unequivocal proof of a recall, I would not recommend a surgical procedure

to remove Mr. Allen's device unless I found specific medical indications that such an intervention was necessary in his circumstances. Indications the filter was malfunctioning or presenting some other complication may include discomfort at the site of the filter, swelling in that area and a fever. As indicated below, repeated examinations by medical providers on the Kilby medical staff confirmed the absence of any indications of any complication whatsoever with respect to his IVC filter.

It is unclear to me what Mr. Allen means when he alleges that I refused to "check it." I absolutely deny that I or any other provider on the Kilby medical staff failed to carefully monitor the condition of Mr. Allen's IVC filter and check for any indications of a complication with the device. But prior to and after I learned of Mr. Allen's IVC filter on December 29, 2016, I and other providers examined him on numerous occasions. During these examinations we assessed Mr. Allen's symptoms, and, as confirmed in his medical records, we did not observe any indications of any complication with his IVC filter whatsoever. Mr. Allen also underwent multiple diagnostic procedures which did not detect any indication of any complication whatsoever with the device. While I did not perform the surgical procedure which would have been necessary for me to visually see the IVC filter, if such is Mr. Allen's allegation, such a procedure would have involved a serious risk of medical complication for him and was not necessary to check for complications with the device.

**"Dr. Rahming knew the Plaintiff had an IVC filter prior to discontinuing his blood thinner as this is noted in his medical records upon intake into the ADOC in July of 2014" . . . .** This allegation is false. As I stated in my [prior] affidavit, *I did not know that Mr. Allen had an IVC filter until December 29, 2016,* when his off-site oncologist, Dr. Krishnamohan Basarakodu, informed me during a telephone call that Mr. Allen mentioned the filter during a visit with the oncologist. That same day, i.e. December 29, 2016, I ordered an x-ray study which confirmed the IVC filter. If I knew about the IVC filter prior to December 29, 2016, I would have considered the presence of this device when treating Mr. Allen, including when making decisions with regard to his medications.

**"Dr. Rahming discontinued [Mr. Allen's] blood thinner in October of 2016 in contradiction to orders provided by his free-world oncologist." . . . .** I reject and deny this groundless allegation. Dr. Basarakodu saw Mr. Allen on multiple occasions both prior to and subsequent to my decision on October 11, 2016, to discontinue Mr. Allen's prescription for Warfarin. As confirmed in the medical records relating to Dr. Basarakodu's examinations of Mr. Allen, the off-site oncologist never once advised that I should continue the Warfarin prescription or questioned my judgment. In fact, far from ordering to continue the Warfarin

prescription, Dr. Basarakodu expressly deferred to my clinical judgment in treating Mr. Allen's deep vein thrombosis, or blood clotting.

**"Dr. Rahming's assertions regarding [Mr. Allen]'s failure to take his blood thinner are inaccurate as he missed this medication only twice in three years due to an error by medical personnel." . . . .** Mr. Allen's undisputed medical records flatly contradict [this] groundless allegation. Without unnecessarily repeating the statements in my [first] affidavit, Mr. Allen failed to take his Warfarin on at least twenty-six (26) separate occasions in the year prior to October 11, 2016, including on four (4) occasions in the month prior to that date. Mr. Allen also routinely failed to take other medications during that same period of time. I and other providers on the Kilby medical staff repeatedly counseled Mr. Allen regarding his medication non-compliance, but he declined to comply with our counsel.

**"[Mr. Allen] reported his blurred vision and pain in his left side indication the presence of blood clots but received no treatment for this complaint." . . . .** This allegation is absolutely false, and I deny it in its entirety. From my review of Mr. Allen's medical records, during the period of time between October 11, 2016, _i.e._ the date when I discontinued Mr. Allen's Warfarin prescription, and December 29 2016, when I entered a new Warfarin prescription for him, Mr. Allen did not submit a single sick call slip complaining of blurred vision or discomfort in his left side. Moreover, both Mr. Allen's off-site oncologist and providers on the Kilby medical staff examined Mr. Allen on multiple occasions between October 11, 2016, and December 29, 2016, and did not detect any indications of any complication with respect to his DVT. On these occasions and throughout Mr. Allen's incarceration at Kilby, the providers on the Kilby medical staff carefully evaluated Mr. Allen in response to his concerns and treated his conditions. His medical records unquestionably contradict any allegation that he failed to receive treatment for his DVT.

Doc. 37-1 at 2–5 (emphases in original) (paragraph numbering and internal citations to medical records omitted).

In a second supplemental affidavit, Dr. Rahming addresses his discontinuance of the blood thinner despite the presence of the IVC filter as follows:

As stated in my [prior] affidavits, I do not recall learning prior to approximately December 29, 2016, that Mr. Allen had an IVC filter [as he did not mention this to me during any of my examinations of him]. On that date I received a phone call from Dr. Krishnamohan Basarakodu, an off-site

oncologist who treats Mr. Allen for multiple myeloma (cancer of the plasma cells, that among other things, can weaken the integrity of bones).  During the December 29, 2016, phone call, Dr. Basarakodu reported to me that he examined Mr. Allen that day and that during the examination Mr. Allen mentioned he had an IVC filter.  I ordered an x-ray of Mr. Allen on that same day, i.e. December 29, 2016, which confirmed the presence of the filter.  After confirming the presence of Mr. Allen's IVC filter through the December 29, 2016, x-ray, I determined that restarting Mr. Allen's Warfarin was appropriate and entered an order prescribing Mr. Allen Warfarin for thirty (30) days.  However, contrary to Mr. Allen's allegations, I do not recall learning prior to December 29, 2016, that he hand an IVC filter.  If I were aware of the IVC filter as of October 11, 2016, I would have taken the presence of the filter into account in deciding whether to discontinue Mr. Allen's Warfarin prescription.

Mr. Allen's allegations concerning my knowledge of the purported information in certain documentation are incorrect.  First, with respect to Mr. Allen's allegation that the medical records relating to his intake into the Alabama Department of Corrections ("ADOC") mention that he had an IVC filter, I am not routinely involved in completing inmates' medical intake records and do not recall seeing any mention of an IVC filing in Mr. Allen's intake records prior to my decision to discontinue his Warfarin prescription.  As a routine matter, members of the Kilby nursing staff conduct medical intake into the ADOC.  Mr. Allen went through the intake process in approximately June of 2014.  I do not recall speaking with Mr. Allen at that time.  To the extent that Mr. Allen may have mentioned to a nurse during the intake process that Mr. Allen had a filter and the nurse recorded that in the intake paperwork, I do not recall noting a reference to a filter in Mr. Allen's intake records [and he never mentioned the IVC filter to me prior to December 29, 2016].

Second, I do not recall seeing the passing reference to an IVC filter in one (1) of approximately twelve (12) x-ray reports dated November 13, 2014 in Mr. Allen's medical chart.  The November 13, 2014, report in question related to an x-ray of Mr. Allen's back.  On November 13, 2014, I ordered approximately twelve (12) x-rays for a variety of Mr. Allen's body parts, including his head, back, legs, and arms.  *I did not order the November 13, 2014 x-rays to determine whether Mr. Allen had an IVC filter*.  From my review of Mr. Allen's medical records, and to the best of my recollection, I ordered the series of x-rays (commonly called a skeletal survey) to assess weakening, if any, of Mr. Allen's bone structures that may have been cause by his cancer.  I do not recall noting in November of 2014 that one (1) of the approximately twelve (12) x-ray reports mentioned an IVC filter.  In any

event, I did not recall that reference in October of 2016 when I discontinued Mr. Allen's Warfarin prescription.

Third, I am not routinely involved in reviewing or responding to inmates' medical grievance documentation, and I do not recall reviewing any medical grievance documentation from Mr. Allen prior to October 11, 2016, i.e. the date on which I discontinued his Warfarin prescription, mentioning the presence of an IVC filter. . . . To the extent Mr. Allen claims that he submitted medical grievance documentation which mentioned that he had an IVC filter, I do not recall seeing that documentation, and I am not routinely involved in reviewing or responding to such documentation. I do not recall discussing with Mr. Allen or any member of the Kilby medical staff any medical grievance documentation submitted by Mr. Allen mentioning an IVC filter. As stated above, if I were aware as of October 11, 2016, that Mr. Allen had an IVC filter, I would have taken the presence of the filter into account wen deciding whether to discontinue his Warfarin.

. . . . There is no evidence or objective data that discontinuing Mr. Allen's Warfarin prescription on October 11, 2106, caused his health to change, worsen, or decline in any way whatsoever.

Mr. Allen's medical records confirm that he suffered no adverse effects as a result of the discontinuation of his Warfarin.

After October 11, 2016, i.e. the date on which I discontinued his Warfarin prescription, Mr. Allen received numerous examinations by a variety of medical providers including myself, other medical providers on the Kilby medical staff, and free-world specialists throughout October, November, and December of 2016. As confirmed in the providers' notations relating to those examinations, the providers' examinations did not . . . detect any indications whatsoever that Mr. Allen suffered any adverse effects to his health as a result of the discontinuation of Warfarin. Further, from my review of Mr. Allen's relevant medical records, I could not find any sick call requests submitted by him between October 11, 2016 and December 28, 2016. This failure [by Mr. Allen] to request medical care or voice concerns regarding [his] health during that period of time further confirms that he did not experience a decline in his health as a result of the discontinuation of his Warfarin prescription.

Similarly, multiple examinations by medical providers after I restarted Mr. Allen's Warfarin on December 29, 2016, did not find any indication that he suffered any decline to his health due to the period of time in which he did not have a Warfarin prescription. For example, a physician on the Kilby medical staff evaluated and examined Mr. Allen on January 9, 2017, and found normal results. During the January 9, 2017, examination, Mr. Allen voiced that he was doing "okay." Since February of 2017, I, as well as other medical providers on the Kilby medical staff, have continued to monitor and

evaluate Mr. Allen's health, and we have not detected any indications that his health declined or suffer in [way] whatsoever as a result of the brief period of time in which he did not have a Warfarin prescription.

Doc. 51-1 at 2–6 (paragraph numbering and internal citations to medical records omitted).

Finally, Dr. Rahming filed a third supplemental affidavit in which he addresses the claim presented by Allen regarding alleged information provided to Dr. Rahming by Allen's free world oncologist, Dr. Krishnamohan Basarakodu, via email or other communication that he not discontinue Allen's blood thinner. In this affidavit, Dr. Rahming avers that:

Dr. Krishnamohan Basarakodu ("Dr. Basarakodu") never recommended to me, via email, telephone conversation, or any other means of communication, that I not discontinue Mr. Allen's Warfarin prescription. Warfarin is a blood-thinning medication also sold under the brand name Coumadin. To my knowledge, Dr. Basarakodu never formed the medical judgment that Mr. Allen's Warfarin prescription should not be discontinued. Thus, I did not discontinue Mr. Allen's Warfarin prescription with the knowledge that Dr. Basarakodu had advised otherwise.

The medical records completed by Dr. Basarakodu relating to Mr. Allen reveal that, rather than recommending that Mr. Allen continue receiving Warfarin, Dr. Basarakodu expressly left the decision [whether] to continue Mr. Allen on the medication to my medical judgment. For example, in Dr. Basarakodu's December 29, 2016, report following his examination of Mr. Allen, Dr. Basarakodu expressly stated that "Dr. Rahming will decide on restarting anticoagulation." Similarly, Dr. Basarakodu left restarting Warfarin to my medical judgment on two (2) other occasions in an evaluation of Mr. Allen on October 27, 2016 and December 1, 2016, respectively.

In my medical judgment, I discontinued Mr. Allen's Warfarin prescription due to his persistent medical non-compliance in taking the medication. If Dr. Basarakodu had recommended against discontinuing the medication or recommended that I restart the medication, I certainly would have considered such a recommendation in deciding on the appropriate course of treatment for Mr. Allen. **However, Dr. Basarakodu never advised me not to discontinue . . . Mr. Allen's Warfarin, but rather, left it to my medical judgment**.

Doc. 66-1 at 2–3 (emphases in original) (paragraph numbering and internal citations to medical records omitted).

Furthermore, in response to Allen's assertion that Dr. Basarakodu sent emails to Dr. Rahming addressing the discontinuation of his Warfarin prescription, Laura Hale, a Certified Electronic Discovery Specialist, submitted an affidavit in which she states that a comprehensive "***search of Dr. Rahming's email account did not locate any emails sent or received from Dr. Basarakodu relating to Mr. Allen in any way whatsoever***. It is my opinion that, contrary to Mr. Allen's allegations, Dr. Rahming did not receive any emails from Dr. Krishnamohan Basarakodu referencing Mr. Allen's IVC filter or his medication." Doc. 66-2 at 3 (emphasis in original).

In her affidavit, Nurse Lockhart addresses Allen's allegations as follows:

> As demonstrated in Mr. Allen's medical records, I along with the other medical providers at Kilby provided [Mr. Allen] with thorough, appropriate care for his DVT in the year prior to October of 2016. This care included numerous examinations; regular testing to measure the clotting tendency of Mr. Allen's blood; and a variety of medications. Mr. Allen received routine examinations by medical providers in the chronic care clinic during his incarceration prior to October of 2016.
>
> The Kilby medical staff evaluates and teats certain pre-defined chronic medical conditions through the chronic care clinic process. The conditions treated at the chronic care clinics include DVT. An inmate may be seen for multiple conditions during a single chronic care visit. The medical providers on the Kilby medical staff determine, based upon the condition of the inmate, whether an inmate is seen at intervals of thirty (30), sixty (60) or ninety (90) days.
>
> Despite the care exhibited by the Kilby medical staff, Mr. Allen repeatedly refused to comply with the directives of his providers, both regarding his medications and other matters, and failed to attend [some of] his scheduled appointments in the chronic care clinic. Mr. Allen persisted in this non-compliance despite the repeated efforts of his medical providers to

counsel him regarding the importance of complying with their directives and taking his medications.

On October 11, 2016, Dr. Rahming exercised his medical judgment and discontinued Mr. Allen's Warfarin. Warfarin is a blood thinning medication which prevents blood clotting. However, Warfarin increases the risk for dangerous bleeding out because it thins a patient's blood.

I did not participate in the decision to discontinue Mr. Allen's Warfarin because decisions of this sort are typically relegated to the attending physician. However, it is my understanding that Dr. Rahming determined that Mr. Allen's failure to take the medication as prescribed by Mr. Allen's providers increased the risk that he could bleed out without effectively treating his DVT.

Following Dr. Rahming's termination of Mr. Allen's Warfarin on October 11, 2016, I saw Mr. Allen on multiple occasions. My examinations of Mr. Allen on these occasions never detected any indication whatsoever that he experienced any complication from the discontinuation of his Warfarin. Mr. Allen never expressed to me any concern about Warfarin or a desire to take the medication again. If I learned that Mr. Allen required different or additional medical care, I would have ensured that he received this care.

It is my understanding that Dr. Rahming restarted Mr. Allen's Warfarin prescription on December 29, 2016. I understand that Dr. Rahming reached this decision after learning that Mr. Allen had an IVC filter, which increases the risk of blood clotting.

. . . . Although I did not play any role whatsoever in the decision to discontinue or restart Mr. Allen's Warfarin, I provided thorough, appropriate care to him throughout his incarceration at Kilby. This medical care included conducting numerous examinations; prescribing medications, ordering diagnostic lab work and procedures; and referring him off site to see specialists.

I absolutely deny Mr. Allen's allegation that I or any other member of the Kilby medical staff failed to do something related to his medical care. Based upon my experience in treating patients like Mr. Allen, the medical attention and treatment provided to Mr. Allen during his incarceration was appropriate and well within the [prescribed] standard of care[.] I did not engage in any activity or fail to take any necessary actions which resulted in or contributed to any harm or injury allegedly incurred by Mr. Allen. On no occasion did I refuse to follow the directives or recommendations of any physician as it relates to the medical care provided to Mr. Allen. No one at Kilby, to my knowledge, ever refused to follow such directives. I never interfered, and I am unaware of anyone who interfered, in any way with any

medical treatment sought or received by Mr. Allen. I never mistreated Mr.
Allen or ignored any medical complaints he made to me. . . .

Doc. 21-2 at 2–5 (paragraph numbering and internal citations to medical records omitted).

Nurse Baker likewise denies acting with deliberate indifference to Allen's medical needs

and does so in substantially the same terms as those set forth by Nurse Lockhart. *See* Doc.

21-3 at 1–5.

Under the circumstances of this case, the court finds that the course of treatment

undertaken by the defendants did not violate Allen's constitutional rights. Specifically,

there is no evidence upon which the court could conclude that the defendants acted in a

manner that was "so grossly incompetent, inadequate, or excessive as to shock the

conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (internal

quotation marks and citation omitted). Rather, the evidence before the court demonstrates

that medical personnel evaluated Allen each time he reported to the health care unit for

treatment, prescribed medication to him in accordance with their professional judgment,

ordered tests to aid in their assessment and treatment of his conditions, and referred him to

outside specialists, including an oncologist, for treatment of his various medical needs.

Whether Dr. Rahming "should [not] have [temporarily discontinued Allen's Warfarin

prescription] is a classic example of a matter for medical judgment and therefore not an

appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d

at 1545 (internal quotation marks and citation omitted). Moreover, to the extent the claims

for relief sound in negligence or medical malpractice, neither of these constitutes deliberate

indifference actionable in a § 1983 case. *Farmer*, 511 U.S. at 836; *Taylor*, 221 F.3d at

1258; *Matthews*, 282 F. App'x at 771. Furthermore, an inmate's desire for a different course of medical treatment does not constitute deliberate indifference violative of the Constitution. *Hamm*, 774 F.2d at 1505; *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

Allen's self-serving assertions of deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead v, Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("Although [Allen] attempts to overcome summary judgment by offering his own sworn statement[s] . . . to support his allegations, the contemporaneous medical records and opinions of the examining medical doctors show that this purported evidence is baseless."); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Allen has failed to present any evidence showing the defendants knew that the manner in which they provided treatment to him created a substantial risk to his health and with this knowledge consciously disregarded the risk. The record is therefore devoid of evidence—significantly probative or otherwise—showing that the defendants acted with deliberate indifference to Allen's medical needs. Consequently, summary judgment is due to be granted in favor of the defendants on the plaintiff's claim that they acted in violation of his constitutional rights in provided him medical treatment.

## B. Request for Criminal Prosecution

Insofar as Allen seeks to have state criminal charges brought against the defendants, he is due no relief from this court. A "private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Nelson v. Skehan*, 386 F. App'x 783, 786 (10th Cir. 2010) (holding that a plaintiff has no constitutional right to have a defendant prosecuted); *Napier v. Baron*, 198 F.3d 246, 1999 WL 1045169, *1 (6th Cir. 1999) ("[T]he district court properly dismissed [Plaintiff's] complaint as frivolous . . . [because] contrary to [his] belief, he does not have a constitutional right to have a particular person criminally charged and prosecuted."); *see also Rockefeller v. United States Court of Appeals Office for Tenth Circuit Judges*, 248 F.Supp.2d 17, 23 (D.D.C 2003) (criminal statutes "do not convey a private right of action."); *Risley v. Hawk*, 918 F.Supp. 18, 21 (D.D.C. 1996), *aff'd*, 108 F.3d 1396 (D.C. Cir. 1997) (no private right of action exists under federal statute criminalizing conspiracies to deprive an individual of his constitutional rights); *Gipson v. Callahan*, 18 F.Supp.2d 662, 668 (W.D.Tex 1997) ("Title 18 U.S.C. § 242 makes it a crime to willfully deprive persons under color of law of their rights under the Constitution or laws of the United States. The statute does not create a private cause of action. *Powers v. Karen*, 768 F.Supp. 46, 51 (E.D.N.Y. 1991), *aff'd*, 963 F.2d 1552 (2nd Cir. 1992); *Dugar v. Coughlin*, 613 F. Supp. 849, 852 n.1 (S.D.N.Y. 1985)."). Thus, any request for criminal prosecution of the defendants alleges violation of a legal interest which clearly does not exist, and summary judgment is therefor due to be granted in favor of the defendants on this claim.

## IV. CONCLUSION

Accordingly, it is ORDERED as follows:

1.     The defendants' motion for summary judgment is GRANTED.

2.     Judgment is GRANTED in favor of the defendants.

3.     This case is DISMISSED with prejudice.

4.     Costs are taxed against the plaintiff.

DONE this 11th day of December, 2019.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE